In the Matter of SIERRA TELCOM SERVICES, INC., Petitioner, v THOMAS F. HARTNETT, as Commissioner of Labor, et al., Respondents. (Proceeding No. 1.)

In the Matter of ERICSSON BUSINESS COMMUNICATIONS, INC., Petitioner, v THOMAS F. HARTNETT, as Commissioner of Labor, et al., Respondents. (Proceeding No. 2.)

Third Department, January 30, 1992

APPEARANCES OF COUNSEL

*Couch, White, Brenner, Howard & Feigenbaum (Leslie F. Couch* of counsel), for Sierra Telcom Services, Inc., petitioner.

*Gibson, Dunn & Crutcher (Jonathan L. Sulds* of counsel), for Ericsson Business Communications, Inc., petitioner.

*Robert Abrams, Attorney-General (M. Patricia Smith* and *Jane Lauer Barker* of counsel), for respondents.

**OPINION OF THE COURT**

LEVINE, J.

In May 1988, petitioner in proceeding No. 2, Ericsson Business Communications, Inc. (hereinafter Ericsson), entered into a contract with the State University of New York at New Paltz (hereinafter SUNY) in which it agreed to install a telecommunications system on the SUNY campus in the Town

of New Paltz, Ulster County. In June 1988, Ericsson subcontracted certain work on the project to petitioner in proceeding No. 1, Sierra Telcom Services, Inc. (hereinafter Sierra). The contract specifications included a prevailing wage schedule previously requested by SUNY, which described the project as "[i]nstallation of [t]elecommunications [s]ystem".

In July 1988, in response to correspondence from an unsuccessful subcontract bidder on the SUNY project, respondent Department of Labor commenced an investigation of Sierra's compliance with the prevailing wage requirements of Labor Law § 220 (3). On August 1, 1988, Kevin Jones, an investigator from the Department's Bureau of Public Work, visited the site and spoke with Sierra's project manager, Brent Wright, and eight Sierra employees. At that time, Wright informed Jones that he was paying the groundman wage rate under the electrician-lineman classification on the prevailing wage schedule then in effect* and that many workers were receiving apprentice wages. All of the Sierra employees with whom Jones spoke told him that their work involved some aspect of telephone system installation.

On August 19, 1988, Jones returned to the project site and advised Wright that Sierra was required to pay its employees the electrician rate under prevailing wage schedule 5b, because it was the only rate that covered telephone installation work in the locality. Jones also informed Wright that Sierra could not pay its employees as apprentices unless they were registered as such with the Department. A few months later at a meeting with Ericsson's job superintendent, Jones pointed out the applicable rate for telephone installers under the new prevailing wage schedule 6a. Sierra continued its payment practices up until the time of project completion in February 1989. The Department concluded its investigation in May 1990 with a finding that Sierra had underpaid 81 of its employees wages and/or wage supplements totaling nearly $400,000.

Following a hearing held in October 1990, the Administrative Hearing Officer (hereinafter AHO) determined, *inter alia,*

---

* There were two different prevailing wage schedules in effect during the SUNY project. Schedule 5b, which was applicable through June 1988 (the first four weeks of the project), was promulgated based on the collective bargaining agreement of IBEW Local 806 in the Village of Ellenville, Ulster County. That union was subsequently taken over by IBEW Local 631 in the City of Newburgh, Orange County, and schedule 6a was promulgated based on a new collective bargaining agreement, the Telephone Interconnect Agreement.

that Sierra had underpaid 81 of its employees in willful violation of Labor Law § 220 (3). Ericsson, as prime contractor, was found to be financially responsible for the underpayments, interest and the 10% civil penalty assessed against Sierra *(see,* Labor Law § 223). Respondent Commissioner of Labor essentially adopted the AHO's report and recommendations and calculated the total amount of underpayments, plus interest and penalty, to be $559,655.74. Petitioners then commenced these two separate CPLR article 78 proceedings in this court pursuant to Labor Law §§ 220 and 220-b seeking to annul the Commissioner's determination.

■ Petitioners' principal contention in these proceedings is that the Commissioner's determination regarding the classification of and wage rates for Sierra's employees was not supported by substantial evidence. We disagree. Classification of trades or occupations is a matter within the expertise of the Department and determinations with respect thereto should not be disturbed in the absence of a clear showing that a classification does not reflect " 'the nature of the work actually performed' " *(Matter of General Elec. Co. v New York State Dept. of Labor,* 154 AD2d 117, 120, *affd* 76 NY2d 946, quoting *Matter of Kelly v Beame,* 15 NY2d 103, 109). Here, no such showing was made. We note initially that the proof adduced at the hearing amply established that Sierra's work on the project involved solely the installation of a telecommunications system. The Commissioner determined that the proper classification for the majority of workers employed on that project was electrician/telephone installer under schedule 5b and telephone installer under schedule 6a.

In arriving at this determination, it was clearly permissible for the Commissioner to look to the Telephone Interconnect Agreement, the local collective bargaining agreement between IBEW Local 631 and the Newburgh Division of the Eastern New York State Chapter of the National Electrical Contractors Association Inc., to establish the job duties of the classification *(see, Matter of Naftilos Painting & Sandblasting v Hartnett,* 173 AD2d 964, 966). That agreement, by its own terms, covers:

"[A] All erection, installation, maintenance, repair and service work of Telephone Interconnect Communication systems, devices, and cables including Private Branch Exchanges (PBX-PABX), Key Equipment and associated devices * * *

"[B] * * * all power and lighting construction work per-

formed in conjunction with the work referred to in (A) above including conduit, wire, power panels, emergency power, batteries, buss, motor generators and all directly related work which becomes an integral part of the power system."

Furthermore, Jones, who reviewed the above-described agreement and discussed the matter with the union's business agent, testified that telephone installation embraced "[e]verything from unloading the trucks when they get there to cleaning it up at the end". Under the collective bargaining agreement, all workers doing telecommunications work in the locality were to be paid one of four telephone technician wage rates. Thus, the Commissioner could properly conclude that, despite the Department's inability to determine the specific job duties of each Sierra worker, all 81 workers were entitled to receive, at a minimum, the wage rate for telephone installer, the lowest of the four rates. Despite petitioners' assertion to the contrary, the electrician-lineman classification used by Sierra did not cover telecommunications installation in Ulster County.

■ Next, we reject petitioners' claim that the Commissioner's determination was affected by various errors of law. Petitioners argue first that SUNY failed to classify the workers to be employed on the project or to provide a description of the work to be performed as required by Labor Law § 220 (3-a) (a). SUNY's "request for proposal", however, which was sent to bidders on the project, described the project's system and cable requirements, operational tests and performance and maintenance. In our view, this document specified the work in sufficient detail to constitute compliance with the statute (see, *Matter of General Elec. Co. v New York State Dept. of Labor, supra*).

■ Equally unavailing is petitioners' assertion that the Department's investigation was unlawful because it was initiated as the result of a complaint by one of Sierra's competitors. Labor Law § 220 (7) permits the fiscal officer, the Commissioner here, to cause a compliance investigation to be made "on his own initiative". The record indicates that the investigation in this case, while prompted by a letter from an unsuccessful bidder, was initiated by the Director of the Bureau of Public Work, a designee of the Commissioner. Under these circumstances, we cannot conclude that the investigation was unlawful.

■ Nor can we conclude that the AHO's refusal to issue the

subpoena duces tecum requested by petitioners warrants annulment of the Commissioner's determination. It is undisputed that the Department turned over to petitioners its complete file containing all information relevant to the compliance investigation and the Department procedure manual which, although not initially made available to petitioners, was later produced upon their request. The balance of the information sought by petitioners was not a part of the Department's file and we agree with the AHO that such information was not relevant to the issues to be determined at the hearing *(cf., Matter of Hull-Hazard, Inc. v Roberts,* 120 AD2d 979, 979-980).

■ We turn next to Sierra's contention that the Department's adoption of the wage rates set forth in the local collective bargaining agreement represented an unconstitutional delegation of power. This claim is unpersuasive. The statutory requirements of Labor Law § 220 (5) that the employer under the collective bargaining agreement employ at least 30% of the workers engaged in the same trade or occupation in the locality provide sufficient standards, before the wage provisions of the agreement may be used, so as to overcome any constitutional objection based upon delegation of legislative power to private parties *(see, Matter of General Elec. Co. v New York State Dept. of Labor,* 154 AD2d 117, 121, *supra).* We do not read the case relied on by Sierra, *General Elec. Co. v New York State Dept. of Labor* (936 F2d 1448), to require a contrary conclusion. In that case, the collective bargaining agreement utilized by the Department in establishing a prevailing wage rate contained two separate wage rates and a provision explicitly barring application of the lower wage rate to public work projects. The Second Circuit held that if it could be demonstrated that the two-tier wage system was collusively negotiated and then simply adopted by the Department without the exercise of any discretion, an unconstitutional application of Labor Law § 220 would be established *(see, supra,* at 1459). Because the facts of this case are clearly distinguishable from *General Elec.,* Sierra's reliance thereon is misplaced.

■ The only other issue requiring discussion concerns Sierra's challenge to the Commissioner's determination that its violation of Labor Law § 220 was willful. In support of this argument, Sierra claims that Jones' failure to give it prompt written notice of violation in accordance with the Department's procedure manual precludes a finding that it know-

ingly or intentionally violated the prevailing wage requirements. We disagree. There was ample proof in the record that Jones orally advised representatives from both Sierra and Ericsson on more than one occasion of the prevailing wage violations and the correct wages to be paid. Sierra's contention that, as an out-of-State contractor, it had no reason to know of the prevailing wage requirements is belied by its subcontract with Ericsson which makes express reference thereto. Because Sierra continued to adhere to its payment practices after being notified that they were violative of Labor Law § 220, the finding of willfulness should not be disturbed *(see, Matter of Tap Elec. Contr. Serv. v Hartnett,* 76 NY2d 164, 170-171). As a final matter, we cannot agree with Sierra that the Commissioner's imposition of a 10% penalty *(see,* Labor Law § 220 [8]) was arbitrary or capricious.

We have examined petitioners' remaining contentions and find that they are either not properly before us, because they were not raised at the administrative level *(see, Matter of Bridgestone/Firestone, Inc. v Hartnett,* 175 AD2d 495, 498), or lacking in merit.

MERCURE, CREW III, MAHONEY and CASEY, JJ., concur.

Adjudged that the determination is confirmed, without costs, and petitions dismissed.